BILAL A. ESSAYLI
United States Attorney
CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division
GREGG E. MARMARO (Cal. Bar No. 338627)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-8500
    Facsimile: (213) 894-0141
    E-mail:   gregg.marmaro@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:25-CR-00123-AB-1 |
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT SYLAS NYUYDZENE VERDZEKOV |
| v. | |
| SYLAS NYUYDZENE VERDZEKOV, | |
| Defendant. | |

1. This constitutes the plea agreement between SYLAS NYUYDZENE VERDZEKOV ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case. This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2. Defendant agrees to:

    a. At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to the single-count Indictment in United States v. Sylas Verdzekov, et al., No. 2:25-CR-

00123-AB-1, which charges defendant with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).

    b.    Not contest facts agreed to in this agreement.

    c.    Abide by all agreements regarding sentencing contained in this agreement.

    d.    Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

    e.    Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

    f.    Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

    g.    Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

    h.    Defendant agrees that any and all criminal debt ordered by the Court will be due in full and immediately.  The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

    i.    Complete the Financial Disclosure Statement on a form provided by the USAO and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the USAO by either email at usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial

Litigation Section at 300 North Los Angeles Street, Suite 7516, Los Angeles, CA 90012.  Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j.    Authorize the USAO to obtain a credit report upon returning a signed copy of this plea agreement.

k.    Consent to the USAO inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

3.    Defendant further agrees:

a.    To forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, or involved in the illegal activity to which defendant is pleading guilty, specifically including, but not limited to, the following (paragraphs 3(a)(i)-3(a)(iv) below, collectively, the "Forfeitable Property"):

i.    The following Bank Funds:

(I)  $247,247.20 in Bank Funds seized from a JPMorgan Chase Bank account with the last four digits ending in 3573;

(II) $1,765.04 in Bank Funds seized from a JPMorgan Chase Bank account with the last four digits ending in 8286;

(III)    $98,120.00 in Bank Funds seized from a Bank of America account with the last four digits ending in 8949;

(IV) $113,136.34 in Bank Funds seized from a Bank of America account with the last four digits ending in 9849;

(V)   $15,990.15 in Bank Funds seized from a Bank of America account with the last four digits ending in 1502;

(VI)  $104,034.65 in Bank Funds seized from a Bank of America account with the last four digits ending in 5326;

(VII)   $31.87 in Bank Funds seized from a Bank of America account with the last four digits ending in 3289;

(VIII)   $8,776.39 in Bank Funds seized from a Bank of America account with the last four digits ending in 7805;

(IX)  $125,012.11 in Bank Funds seized from a Bank of America account with the last four digits ending in 7794;

(X)  $37,340.06 in Bank Funds seized from a Bank of America account with the last four digits ending in 5856;

(XI) $51,950.30 in Bank Funds seized from a Bank of America account with the last four digits ending in 7833;

(XII)   $76.16 in Bank Funds seized from a Bank of America account with the last four digits ending in 0117;

(XIII)   $1,109.31 in Bank Funds seized from a Bank of America account with the last four digits ending in 8501;

(XIV)   $170,012.63 in Bank Funds seized from a Bank of America account with the last four digits ending in 1183;

(XV) $49,515.77 in Bank Funds seized from a Bank of America account with the last four digits ending in 3255;

(XVI)   $39,800.87 in Bank Funds seized from a Bank of America account with the last four digits ending in 2790;

(XVII)   $18.18 in Bank Funds seized from a Bank of America account with the last four digits ending in 3284;

(XVIII)   $9.48 in Bank Funds seized from a Bank of America account with the last four digits ending in 3242;

4

(XIX)    $7.65 in Bank Funds seized from a Bank of America account with the last four digits ending in 9892;

(XX) $4.54 in Bank Funds seized from a Bank of America account with the last four digits ending in 3268;

(XXI)    $0.55 in Bank Funds seized from a Bank of America account with the last four digits ending in 3271;

(XXII)    $40,470.82 in Bank Funds seized from a Wells Fargo account with the last four digits ending in 1885.

(XXIII)    $90,155.23 in Bank Funds seized from a Wells Fargo account with the last four digits ending in 0909;

(XXIV)    $40 in Bank Funds seized from a Wells Fargo account with the last four digits ending in 2276;

(XXV)    All Bank Funds located at Unify Credit Union for membership account ending in 6107;

(XXVI)    All Bank Funds located at Credit Union of Southern California for membership account ending in 3613;

(XXVII)    All Bank Funds on deposit in JP Morgan Chase account with the last four digits ending in 1757;

(XXVIII)    All Bank Funds on deposit in JP Morgan Chase account with the last four digits ending in 9367;

(XXIX)    All Bank Funds on deposit in JP Morgan Chase account with the last four digits ending in 8551;

(XXX)    All Bank Funds on deposit in JP Morgan Chase account with the last four digits ending in 1819;

(XXXI)    All Bank Funds on deposit in JP Morgan Chase with the last four digits ending in 2655;

(XXXII)    All Bank Funds on deposit in JP Morgan Chase with the last four digits ending in 5867;

1              (XXXIII)   All Bank Funds on deposit in JP Morgan

2  Chase with the last four digits ending in 2108;

3              (XXXIV)    All Bank Funds on deposit in JP Morgan

4  Chase with the last four digits ending in 2865;

5              (XXXV)     All Bank Funds on deposit in JP Morgan

6  Chase with the last four digits ending in 3152;

7              (XXXVI)    All Bank Funds on deposit in JP Morgan

8  Chase with the last four digits ending in 9003;

9              (XXXVII)   All Bank Funds on deposit in JP Morgan

10 Chase with the last four digits ending in 8260;

11             (XXXVIII)  All Bank Funds on deposit in JP Morgan

12 Chase with the last four digits ending in 8286;

13             (XXXIX)    All Bank Funds on deposit in JP Morgan

14 Chase with the last four digits ending in 8286;

15             (XL) All Bank Funds on deposit in US Bank account

16 with the last four digits ending in 8873;

17             (XLI)      All Bank Funds on deposit in US Bank

18 account with the last four digits ending in 8881;

19             (XLII)     All Bank Funds on deposit in Bank of

20 America with the last four digits ending in 9160;

21             (XLIII)    All Bank Funds on deposit in Bank of

22 America account with the last four digits ending in 7654;

23        ii.  The following cryptocurrency:

24             (I)  0.00041331 BTC from wallet address,

25 bc1qp5px09t6skjr9j5cxp8qsvarxywhjjdpcgf6ye (USD value at time of

26 transfer $36.26);

27

28

1          (II) 0.079668030146899102 ETH from wallet

2    address, 0xf8E7392Cb4FF992a75f54588B36c24cf373855fD (USD value at

3    time of transfer $173.96);

4          (III)    161.012335 TRX from wallet address,

5    TH925vHUhhWPDdD67CQ3VKcqGvTDCxcgou (USD value at time of transfer

6    $39.02);

7          (IV) 45.799647 USDT-ETH from wallet address,

8    0xf8E7392Cb4FF992a75f54588B36c24cf373855fD (USD value at time of

9    transfer $45.78); and

10          (V)   1,165,063.541977 USDT-TRX from wallet

11    address, TH925vHUhhWPDdD67CQ3VKcqGvTDCxcgou (USD value at time of

12    transfer $1,164,714.02).

13          iii. The following property seized on February 27,

14    2025, at 16301 Butterfield Ranch Road #16302, Chino Hills, CA 91709:

15          (I)  $36,950 in U.S. Currency; and

16          (II) $134,250 in postal money orders.

17          iv.  The following property seized on February 27,

18    2025, at 15315 Red Barn Court, Unit D-1176, Chino Hills, CA 91709:

19          (I)  $3,789.11 in six cashier's checks.

20     b.   To the Court's entry of an order of forfeiture at or

21    before sentencing with respect to the Forfeitable Property and to the

22    forfeiture of the assets.

23     c.   That the Preliminary Order of Forfeiture shall become

24    final as to the defendant upon entry.

25     d.   To take whatever steps are necessary to pass to the

26    United States clear title to the Forfeitable Property, including,

27    without limitation, the execution of a consent decree of forfeiture

28

and the completing of any other legal documents required for the transfer of title to the United States.

      e.   Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Property.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Property on behalf of himself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Property.  Defendant further waives any and all notice requirements of 18 U.S.C. § 983(a)(1)(A).

      f.   Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Property.

      g.   Not to claim that reasonable cause to seize the Forfeitable Property was lacking.

      h.   To prevent the transfer, sale, destruction, or loss of the Forfeitable Property to the extent defendant has the ability to do so.

      i.   That forfeiture of Forfeitable Property shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

      j.   With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other

means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Property in any proceeding on any grounds including, without limitation, that the forfeiture constitutes an excessive fine or punishment.  Defendant acknowledges that the forfeiture of the Forfeitable Property is part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty plea.

                    THE USAO'S OBLIGATIONS

     4.   The USAO agrees to:

          a.   Not contest facts agreed to in this agreement.

          b.   Abide by all agreements regarding sentencing contained in this agreement.

          c.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

          d.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for violations of 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1349 (Conspiracy), 18 U.S.C. §§ 1956 and 1957 (Money Laundering), or 18 U.S.C. § 1544 (Misuse of a Passport), arising out of defendant's conduct described in the agreed-to factual basis set

1   forth in paragraph 12 below.  Defendant understands that the USAO is

2   free to criminally prosecute defendant for any other unlawful past

3   conduct or any unlawful conduct that occurs after the date of this

4   agreement.  Defendant agrees that at the time of sentencing the Court

5   may consider the uncharged conduct in determining the applicable

6   Sentencing Guidelines range, the propriety and extent of any

7   departure from that range, and the sentence to be imposed after

8   consideration of the Sentencing Guidelines and all other relevant

9   factors under 18 U.S.C. § 3553(a).

10                          <u>NATURE OF THE OFFENSE</u>

11      5.   Defendant understands that for defendant to be guilty of

12   the crime charged in the single-count Indictment, that is, Conspiracy

13   to Commit Money Laundering, in violation of Title 18, United States

14   Code, Section 1956(h), the following must be true: (1) there was an

15   agreement to commit money laundering; (2) the defendant knew the

16   objective of the agreement; and (3) the defendant joined the

17   agreement with the intent to further its unlawful purpose.

18      6.   Defendant understands that for defendant to be guilty of

19   the object of the conspiracy charged in the single-count Indictment,

20   that is, concealment money laundering, in violation of Title 18,

21   United States Code, Section 1956(a)(1)(B)(i), the following must be

22   true: (1) the defendant conducted or intended to conduct a financial

23   transaction involving property that represented the proceeds of

24   unlawful activity; (2) the defendant knew that the property

25   represented the proceeds of some form of unlawful activity; and

26   (3) the defendant knew that the transaction was designed in whole or

27   in part to conceal or disguise the nature, location, source,

28   ownership, or control of the proceeds.

1

<u>PENALTIES AND RESTITUTION</u>

2      7.   Defendant understands that the statutory maximum sentence

3 that the Court can impose for a violation of Title 18, United States

4 Code, Sections 1956(h) and 1956(a)(1)(B)(i), is: 20 years'

5 imprisonment; a three-year period of supervised release; a fine of

6 $500,000 or twice the gross gain or gross loss resulting from the

7 offense, whichever is greatest; and a mandatory special assessment of

8 $100.

9      8.   Defendant understands that defendant will be required to

10 pay full restitution to the victims of the offense to which defendant

11 is pleading guilty.  Defendant agrees that, in return for the USAO's

12 compliance with its obligations under this agreement, the Court may

13 order restitution to persons other than the victims of the offense to

14 which defendant is pleading guilty and in amounts greater than those

15 alleged in the count to which defendant is pleading guilty.  In

16 particular, defendant agrees that the Court may order restitution to

17 any victim of any of the following for any losses suffered by that

18 victim as a result: (a) any relevant conduct, as defined in U.S.S.G.

19 § 1B1.3, in connection with the offense to which defendant is

20 pleading guilty; and (b) any charges not prosecuted pursuant to this

21 agreement as well as all relevant conduct, as defined in U.S.S.G.

22 § 1B1.3, in connection with those charges.  The parties currently

23 believe that the applicable amount of restitution is approximately

24 $10,549,571.87, but recognize and agree that this amount could change

25 based on facts that come to the attention of the parties prior to

26 sentencing.

27      9.   Defendant understands that supervised release is a period

28 of time following imprisonment during which defendant will be subject

11

to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

10.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

11.  Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay

1  removal, removal is presumptively mandatory and a virtual certainty

2  in this case. Defendant further understands that removal and

3  immigration consequences are the subject of a separate proceeding and

4  that no one, including his attorney or the Court, can predict to an

5  absolute certainty the effect of his conviction on his immigration

6  status. Defendant nevertheless affirms that he wants to plead guilty

7  regardless of any immigration consequences that his plea may entail,

8  even if the consequence is automatic removal from the United States.

9  <center>FACTUAL BASIS</center>

10  12. Defendant admits that defendant is, in fact, guilty of the

11  offense to which defendant is agreeing to plead guilty. Defendant

12  and the USAO agree to the statement of facts provided below and agree

13  that this statement of facts is sufficient to support a plea of

14  guilty to the charge described in this agreement and to establish the

15  Sentencing Guidelines factors set forth in paragraph 14 below but is

16  not meant to be a complete recitation of all facts relevant to the

17  underlying criminal conduct or all facts known to either party that

18  relate to that conduct.

19  **Introduction**

20  Beginning no later than on or about November 30, 2021, and

21  continuing to February 27, 2025, in Los Angeles County, within the

22  Central District of California, and elsewhere, defendant SYLAS

23  VERDZEKOV agreed with Co-Conspirator 1, Unknown Co-Conspirators 2-5,

24  Mustapha Selly Yamie, Lovert Che, and other co-conspirators, to

25  knowingly and intentionally commit money laundering, in violation of

26  18 U.S.C. § 1956(a)(1)(B)(i), by conducting or attempting to conduct

27  financial transactions affecting interstate and foreign commerce with

28  the intent to conceal and disguise the nature, location, source,

<center>13</center>

ownership, and control of the proceeds of specified unlawful

activities, namely, mail fraud in violation of 18 U.S.C. § 1341, and

wire fraud in violation of 18 U.S.C. § 1343.  Defendant joined this

agreement knowing its objective and with the intent to further its

unlawful purpose.

### The Elder Fraud and Real Estate Fraud Schemes

The proceeds of specified unlawful activity that defendant and

his co-conspirators laundered and conspired to launder were generated

primarily through mail and wire fraud schemes consisting of elder

fraud scams, real estate scams, and other fraud schemes.  The elder

fraud scams consisted of an elderly victim being targeted by one or

more imposters purporting to be representatives of companies, banks,

or government agencies.  Using false pretenses, representations, and

promises, the imposter deceived the elderly victim into believing

that the victim's bank account had been compromised and would trick

the victim into sending money by interstate wire or check to the

imposter, under false pretenses.  One elder fraud scheme involved a

computer Pop-up/phishing scam where victims received pop-ups and/or

emails saying their computers are corrupted.  Other victims received

invoices for fictious payments they never authorized.  When the

victims called the phone numbers that appeared in the messages,

unknown co-conspirators created an elaborate trust and confidence

scam and eventually convinced the victims to empty their supposedly

compromised bank accounts, purchase cashier's checks, and send the

cashier's checks to private mailboxes controlled by defendant and

others.

The real estate scams consisted of an imposter pretending to act

as a purported seller of real property, when in fact, the purported

seller was not the actual owner of the property and had no authority
to sell it.  Using false pretenses, representations, and promises,
the imposter deceived the victim into believing that they were
entering into a legitimate sale of the property and tricked the
victim into sending money by interstate wire or mailing a check to
the imposter, under false pretenses.  In one such scheme, unknown co-
conspirators initiated the sale of a property they did not own out of
state at a dramatically reduced price (less than 50% of the actual
value).  The properties were empty lots that had not transferred
ownership for several years.  The co-conspirators created a fake
identification matching that of the actual owner of the property.
All communication with the buyer and escrow company was via email.
The escrow company wired the funds of the alleged sale to bank
accounts controlled by the defendant's co-conspirators.

### The Money Laundering Conspiracy

Defendant, Co-Conspirator 1 ("CC-1"), Unknown Co-Conspirators 2-
5 ("UICCs 2-5"), Mustapha Selly Yamie, Lovert Che, and others
(collectively, the "co-conspirators"), conspired to launder and
laundered the proceeds of the above-described elder fraud scams, real
estate scams, and other fraud schemes.  Defendant and his co-
conspirators engaged in thousands of financial transactions designed
to conceal and disguise the nature, location, source, ownership, and
control of the proceeds of these elder fraud scams, real estate
schemes, and other fraud schemes.  Defendant was an organizer and
leader of the money laundering conspiracy, and the conspiracy
involved five or more participants and was otherwise extensive.  To
carry out the money laundering conspiracy, and at defendant's
direction:

15

- Defendant and his co-conspirators obtained or created fake identification documents, including passports and driver's licenses, using synthetic identities, that is, fake identities created using personally identifiable information consisting of a mix of stolen, fictitious, and real information.

- Defendant and his co-conspirators used the synthetic identities to incorporate over 36 shell companies, which did not conduct any legitimate business and were incorporated solely to further the conspiracy.

- Defendant and his co-conspirators opened at least 145 bank accounts and at least 32 private mailboxes under the names of synthetic identities and shell companies.

- Defendant and his co-conspirators caused the proceeds of elder fraud scams, real estate scams, and other mail and wire fraud schemes to be sent by the victims to bank accounts and private mailboxes that defendant and his co-conspirators controlled.

- Defendant and his co-conspirators deposited the funds from victims into bank accounts they controlled and that they opened under synthetic identities and shell companies.

- Defendant and his co-conspirators quickly transferred a substantial portion of those funds through cashier's checks, postal money orders, Automated Clearing House transfers, and wires to other accounts they controlled or mobile payment applications.

- And, defendant and his co-conspirators made large cash withdrawals to use the stolen funds on personal expenses.

1    Specifically, defendant communicated over the phone with Unknown

2    Co-Conspirators 2-5, some of whom were based outside of the United

3    States including in India, about the proceeds of mail and wire fraud

4    schemes being transferred to bank accounts and private mailboxes

5    located in the United States.  Upon receipt of this information from

6    UICCs 2-5, defendant informed Mustapha Selly Yamie, Lovert Che, and

7    other co-conspirators about the incoming criminally-derived proceeds,

8    including in the form of wire transfers, cashier's checks, personal

9    checkbooks, and other items of value.  Defendant, co-conspirators

10   Selly Yamie and Che, and other co-conspirators, communicated about

11   obtaining or creating synthetic identity documents, and about opening

12   bank accounts or private mailboxes under those synthetic identities,

13   to receive those criminally-derived funds caused to be sent by

14   defendant through UICCs 2-5.  Defendant directed co-conspirators

15   Selly Yamie and Che, and other co-conspirators, to retrieve or

16   transfer the criminally-derived proceeds from a bank account or

17   private mailbox.  Then, defendant, and also at defendant's direction

18   co-conspirators Selly Yamie and Che, and other co-conspirators,

19   engaged in numerous financial transactions designed to conceal the

20   nature of the criminally-derived proceeds, as described below.

21   Defendant's offense involved sophisticated laundering, including

22   the following:

23   •    Multiple accounts at numerous financial institutions opened

24        with multiple synthetic identities and shell companies.

25   •    Two or more levels (i.e., layering) of transactions or

26        transfers involving criminally derived funds that were

27        intended to appear legitimate.  Defendant did so through

28        depositing victim funds into bank accounts opened via

17

synthetic identifications or shell companies; quickly drawing the funds through cash withdrawals, cashier's checks, or purchases of postal money orders; or withdrawing funds and depositing them into other synthetic identity accounts controlled by defendant and his co-conspirators or other accounts.

Defendant directed and instructed others throughout the money laundering process, including in how to acquire fake identities including fake passports and driver's licenses; how to provide defendant with bank accounts that would be used to launder funds; how to open mailboxes under synthetic identities; how to deposit funds, withdraw cash, purchase postal money orders, and obtain cashier's checks; and how to deposit laundered proceeds into accounts controlled by other co-conspirators.  After criminally-derived funds had been laundered, defendant remitted a substantial portion of the laundered funds to CC-1 and UICCs 2-5, including in cash, cashier's checks, mortgage payments, and deposits into bank accounts controlled by CC-1 and UICCs 2-5.  Defendant retained a negotiated percentage of the laundered funds for the services he, and others at his direction, provided in laundering the criminally-derived proceeds.

Further, defendant was in the business of laundering funds as evidenced by him: regularly engaging in laundering funds, engaging in laundering funds over an extended period of time, engaging in laundering funds from multiple sources, and generating a substantial amount of revenue in return for laundering funds.

- For example, defendant regularly engaged in laundering funds over an approximately four-plus year period, where he conducted thousands of financial transactions, including

numerous withdrawals and deposits ranging from $100 to $415,000, from bank accounts created using shell companies and synthetic identities.  Defendant knew the bank accounts were funded by deposits directly or indirectly from the proceeds of multiple sources such as elder fraud, real estate fraud, and other mail and wire fraud schemes.

- Additionally, defendant participated in the money laundering conspiracy for over four years, between approximately September 2020 and continuing to February 27, 2025.

- Further, defendant personally used at least twenty synthetic identities to receive and launder the proceeds of mail and wire fraud schemes.  In total, those accounts generated a substantial amount of revenue, specifically, at least $8,713,532.07.

- In total, and at defendant's direction and control, defendant and his co-conspirators laundered at least approximately $10,549,571.87 in funds provided by at least approximately 100 victims of elder fraud scams, real estate scams, and other fraud schemes.

Defendant and his co-conspirators committed several acts in furtherance of the conspiracy.  The following are merely representative victims and overt acts.

**Victim R.P.**

On November 30, 2021, co-conspirator Mustapha Selly Yamie, using the synthetic identity "Jerome Calhoun," caused to be incorporated in California a shell company called "Romehoun Sales."  On January 5, 2022, Mustapha, using the "Jerome Calhoun" synthetic identity, caused

19

to be opened a JP Morgan Chase bank account ending in -9166 in the name of Romehoun Sales (the "Romehoun Sales Chase account").

On September 12, 2022, defendant's co-conspirators, posing as employees of Microsoft and Wells Fargo, called victim R.P., an 82-year-old man from Lake Elsinore, California, and tricked and deceived R.P. by claiming that his computer and bank account had been compromised, and that he needed to wire $43,000 from his family trust account to the Romehoun Sales Chase account, which R.P. thereafter did.

Between September 12 and October 4, 2022, defendant and co-conspirator Mustapha exchanged a series of text messages about the Romehoun Sales company and bank accounts and about the funds stolen from victim R.P.  For example, on September 12, 2022, defendant texted co-conspirator Mustapha, "Check roumhoun. 43K."  Defendant then sent Mustapha two images -- one of the wire confirmation from R.P., and the other of R.P.'s driver's license -- instructing Mustapha to withdraw $9,500 from inside the bank and more from the ATM ("Enter bank and do $9,500.  Then atm.  For today . . . Then tomorrow the same.")  Mustapha replied, "Copy" and "Running to chase now."  On October 4, 2022, Mustapha texted defendant, "That's why Romehoun is staying.  It was the first one we ever made."

Between the day R.P.'s proceeds were deposited into the Romehoun Sales Chase account, and continuing to October 19, 2022, Mustapha withdrew over $45,000 from the account, consisting almost entirely of R.P.'s stolen funds.  Specifically, in a five-week span, Mustapha made 12 withdrawals ranging from $400 to $3,000, and then concluding with a $25,000 withdrawal on October 19, 2022.

1          **Victims S.K. and L.K.**

2          On August 23, 2022, defendant and co-conspirator Mustapha

3     exchanged text messages about the synthetic identity of "George

4     Obeng," specifically, a photograph of a fake driver's license and

5     passport from the Republic of Malawi bearing the name and purported

6     date of birth for "George Obeng."  On August 29, 2022, defendant and

7     co-conspirator Mustapha caused to be opened a Wells Fargo bank

8     account ending in -9398 under the synthetic identity of George Obeng

9     (the "Obeng Wells Fargo account"), using the above-described

10    information on the fake Malawi passport.

11         On January 3, 2023, defendant's co-conspirators, operating an

12    email pop-up scam, tricked and deceived S.K., an 80-year-old man from

13    Hilo, Hawaii, and his wife, L.K., into mailing a $90,000 cashier's

14    check, made out to "George Obeng," to a private mailbox located in

15    Redondo Beach, California.  On January 5, 2023, defendant deposited

16    the $90,000 cashier's check from victims S.K. and L.K. into the Obeng

17    Wells Fargo account.  On January 26, 2023, after FBI agents executed

18    a seizure warrant for the Obeng Wells Fargo account and recovered the

19    $90,000 from it, defendant sent co-conspirator Mustapha a text

20    message stating in part, "all my George obeng accounts closed."

21         **Victim J.G.**

22         On March 1, 2023, co-conspirator Mustapha caused a private

23    mailbox located at 21213 Hawthorne Boulevard, Suite 5090, Torrance,

24    California (the "Torrance Mailbox") to be opened under the synthetic

25    identity of "George Campbell" using a fake Illinois driver's license.

26    Co-conspirator Mustapha also used the same synthetic identity to rent

27    another private mailbox with a fake French passport bearing the name

28    of George Campbell.

1    Between March 3 and March 7, 2023, defendant's co-conspirators,

2    posing as federal law enforcement agents, tricked and deceived J.G.,

3    a 79-year-old woman from Brea, California, into sending two checks

4    each worth approximately $249,900 to the Torrance Mailbox.  On March

5    4, 2023, defendant sent co-conspirator Mustapha a text message with a

6    photograph of the first $249,900 cashier's check stolen from victim

7    J.G., and then texted Mustapha, "We need more mailboxes [because]

8    checks better than wires."  Mustapha replied, "Far better" and "I'll

9    get more," referring to mailboxes.  On March 8, 2023, defendant

10   texted Mustapha a photograph of the second check stolen from victim

11   J.G.

12   **Victim A.B.**

13   On March 10, 2023, at defendant's direction, co-conspirator

14   Mustapha caused to be registered in California a shell company called

15   "Kevin Houseflip LLC" using the synthetic identity "Kevin Booker."

16   Thereafter, Mustapha caused to be opened a private mailbox located at

17   2768 Sepulveda Boulevard, Unit 18, Torrance, California (the

18   "Sepulveda Mailbox") using the synthetic identity of Kevin Booker.

19   On June 30, 2023, defendant's co-conspirators, operating a

20   phishing email scam, tricked and deceived victim A.B., an 85-year-old

21   woman from Vista California, into sending signed, blank checks

22   associated with A.B.'s personal bank account to the Sepulveda

23   Mailbox.  After A.B. sent her checkbook to the Sepulveda Mailbox,

24   defendant wrote approximately 16 checks from A.B.'s checkbook between

25   July 3 and July 24, 2023, totaling approximately $1,064,004.  The

26   checks were made out to and deposited into several bank accounts

27   opened using synthetic identities or shell companies, including Kevin

28   Houseflip, Torres IT, Fuasami Container, Fuasami Motors, Whiskey

Distributors, Obale Tech, and Obale Sales.  At defendant's direction, Mustapha thereafter conducted several financial transactions designed to conceal the nature and origin of those checks, including by purchasing postal money orders, transferring funds to other synthetic identity accounts, and withdrawing at least $155,000 in cash.

**Victim Business 1**

Victim Business 1 was a law firm based in Naples, Florida.  In around March 2023, a client of Victim Business 1 attempted to purchase an empty lot located in Alva, Florida, from an unknown co-conspirator fraudulently identifying himself as W.K., a real person, who falsely misrepresented that he owned the property.  The W.K. impersonator co-conspirator operating a real estate scam described above, provided a Florida license and fraudulent notarized documents stating that he, along with A.L., a real person, owned the property, when in fact they did not.  The unknown co-conspirators thereafter tricked and deceived Victim Business 1 into mailing a $124,021 check to an address in Tarzana, California.

On April 18, 2023, defendant deposited the $124,021 check from Victim Business 1 to a Wells Fargo bank account ending in –7668 that defendant caused to be open in the name of victim W.K.

**Victim Business 2**

On August 12, 2022, defendant and others caused to be opened Wells Fargo bank account ending in -1121 in the name of shell company Whiskey Distributors (the "Whiskey Distributors Wells Fargo account"), using the synthetic identity of Kevin Brown.

On December 16, 2022, an unknown co-conspirator posing as M.M., a real person, and operating a real estate scheme, signed a warranty deed granting the sale of three empty lots for $63,962.  The

unknown conspirator tricked and deceived Victim Business 2, a law firm in Florida, into mailing a check for that amount to the Whiskey Distributors Wells Fargo account.  On December 19, 2022, defendant withdrew approximately $2,000 from this bank account traceable at least in part to fraud proceeds from Victim Business 2.

<div align="center">SENTENCING FACTORS</div>

13.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

14.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 28 | [U.S.S.G. § 2S1.1(a)(2), |
| | | U.S.S.G. § 2B1.1(b)(1)(K)] |
| Business of Laundering Funds: | +4 | [U.S.S.G. § 2S1.1(b)(2)(C)] |
| Sophisticated Laundering: | +2 | [U.S.S.G. § 2S1.1(b)(3)] |
| Aggravating Role: | +4 | [U.S.S.G. § 3B1.1(a)] |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

15.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

16.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<div align="center">WAIVER OF CONSTITUTIONAL RIGHTS</div>

17.   Defendant understands that by pleading guilty, defendant gives up the following rights:

      a.   The right to persist in a plea of not guilty.

      b.   The right to a speedy and public trial by jury.

      c.   The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

      d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

      e.   The right to confront and cross-examine witnesses against defendant.

      f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

      g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## WAIVER OF APPEAL OF CONVICTION

18.    Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

19.    Defendant agrees that, provided the Court imposes a term of imprisonment within or below the range corresponding to an offense level of 35 and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, provided it requires payment of no more than $10,549,571.87; (f) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised

release imposed by the Court: the conditions set forth in Second
Amended General Order 20-04 of this Court; the drug testing
conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the
alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

20.  Defendant also gives up any right to bring a post-
conviction collateral attack on the conviction or sentence, including
any order of restitution, except a post-conviction collateral attack
based on a claim of ineffective assistance of counsel, a claim of
newly discovered evidence, or an explicitly retroactive change in the
applicable Sentencing Guidelines, sentencing statutes, or statutes of
conviction.  Defendant understands that this waiver includes, but is
not limited to, arguments that the statutes to which defendant is
pleading guilty are unconstitutional, and any and all claims that the
statement of facts provided herein is insufficient to support
defendant's plea of guilty.

21.  The USAO agrees that, provided (a) all portions of the
sentence are at or below the statutory maximum specified above and
(b) the Court imposes a term of imprisonment within or above the
range corresponding to an offense level of 35 and the criminal
history category calculated by the Court, the USAO gives up its right
to appeal any portion of the sentence, with the exception that the
USAO reserves the right to appeal the amount of restitution ordered
if that amount is less than $10,549,571.87.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

22.  Defendant agrees that if, after entering a guilty plea
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty plea on any basis other than a
claim and finding that entry into this plea agreement was

27

involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<div align="center">RESULT OF VACATUR, REVERSAL OR SET-ASIDE</div>

23.  Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

<div align="center">EFFECTIVE DATE OF AGREEMENT</div>

24.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<div align="center">BREACH OF AGREEMENT</div>

25.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have

cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

26.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.  Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.  Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.  Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any

evidence derived from the statements should be suppressed or are inadmissible.

### COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

27. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

28. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 14 are consistent with the facts of this case. While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

29. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the

maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

30.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

31.    The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

BILAL A. ESSAYLI
United States Attorney

_____          **5/30/2025**
GREGG E. MARMARO                   Date
Assistant United States Attorney

_____          05/28/2025
SYLAS NYUYDZENE VERDZEKOV          Date
Defendant

_____          05/28/2025
JAMES S. THREATT                   Date
Deputy Federal Public Defender
Attorney for Defendant Sylas
Nyuydzene Verdzekov

1          CERTIFICATION OF DEFENDANT

2       I have read this agreement in its entirety.  I have had enough

3    time to review and consider this agreement, and I have carefully and

4    thoroughly discussed every part of it with my attorney.  I understand

5    the terms of this agreement, and I voluntarily agree to those terms.

6    I have discussed the evidence with my attorney, and my attorney has

7    advised me of my rights, of possible pretrial motions that might be

8    filed, of possible defenses that might be asserted either prior to or

9    at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10   of relevant Sentencing Guidelines provisions, and of the consequences

11   of entering into this agreement.  No promises, inducements, or

12   representations of any kind have been made to me other than those

13   contained in this agreement.  No one has threatened or forced me in

14   any way to enter into this agreement.  I am satisfied with the

15   representation of my attorney in this matter, and I am pleading

16   guilty because I am guilty of the charge and wish to take advantage

17   of the promises set forth in this agreement, and not for any other

18   reason.

19   _____        05/28/2025
                                              _____
20   SYLAS NYUYDZENE VERDZEKOV                 Date
     Defendant

21

22

23

24

25

26

27

28

33

1    CERTIFICATION OF DEFENDANT'S ATTORNEY

2        I am SYLAS NYUYDZENE VERDZEKOV's attorney.  I have carefully and

3    thoroughly discussed every part of this agreement with my client.

4    Further, I have fully advised my client of his rights, of possible

5    pretrial motions that might be filed, of possible defenses that might

6    be asserted either prior to or at trial, of the sentencing factors

7    set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8    provisions, and of the consequences of entering into this agreement.

9    To my knowledge: no promises, inducements, or representations of any

10   kind have been made to my client other than those contained in this

11   agreement; no one has threatened or forced my client in any way to

12   enter into this agreement; my client's decision to enter into this

13   agreement is informed and voluntary; and the factual basis set forth

14   in this agreement is sufficient to support my client's entry of a

15   guilty plea pursuant to this agreement.

16

17   _____          05/28/2025
     JAMES S. THREATT                         _____
     Deputy Federal Public Defender           Date
18   Attorney for Defendant Sylas
     Nyuydzene Verdzekov
19

20

21

22

23

24

25

26

27

28